## FECHHEIMER *v.* SLOMAN *et al.*

(*Circuit Court, D. Nebraska.* January 31, 1888.)

1. FRAUDULENT CONVEYANCES—PREFERENCES TO CREDITORS.
   The evidence indicated nothing that showed fraud or intent to deal otherwise than fairly and diligently. *Held,* that certain creditors who had obtained security should be protected.
2. SAME.
   A brother of a failing debtor had retired from a partnership with the latter only a few months previous to the failure of the latter, and continued about the store, and to engage at times in the latter's business, and it appeared that a large sum of money had been fraudulently concealed by the failing brother. *Held,* that the former should not be preferred as a *bona fide* secured creditor.

In Equity.

Bill in equity by Herman C. Fechheimer who claimed a preference over other creditors of Morris H. Sloman, a merchant doing business under the firm name of Sloman Bros., and filed this bill to foreclose his mortgage security. Other creditors filed cross-bills, and this contest between secured and unsecured creditors arose.

BREWER, J. The controversy in this case is between the secured and the unsecured creditors of Morris H. Sloman, a merchant doing business in the city of Omaha, under the firm name of Sloman Bros. While there are several pleadings by different parties there is but the one controversy, in which the secured creditors may be known as the complainants, and the unsecured as the defendants. The debtor disputes none of the claims, so that, as against him, all are to be treated as just debts. The trouble arises by reason of these facts: On the twenty-ninth of May, 1886, Herman Fechheimer, a creditor living in Detroit, came to Omaha and demanded security. The debtor consented to give a chattel mortgage, but at the same time insisted on giving like security to other holders of what he considered confidential debts. Thereupon mortgages to each of said creditors were executed. Immediately thereafter, and on the same day, Fechheimer filed his bill to foreclose his chattel mortgage, and obtained the appointment of a receiver. The other secured creditors filed their cross-bill, and thereafter three unsecured creditors, having obtained judgment, filed their cross-bill in behalf of themselves and all other unsecured creditors. The entire stock was sold by the receiver, and the money is now in the registry of this court, which fund is the object of pursuit by the various creditors. Now, going back to the history of Morris Sloman's affairs, we find that prior to January, 1886, he was in partnership with his brother Samuel A. Sloman carrying on business under the same firm name; that of Sloman Bros. They had two houses; one in Omaha, and one in Chicago. Eugene Sloman, a younger brother, was in charge of the Chicago house, having an interest in the profits of the concern. On that day Morris Sloman bought out his brother Samuel A. Sloman. The latter was financially responsible; the condition of the former will appear

more fully as we proceed. The consideration of the purchase by Morris Sloman was a house and lot, some Wyoming Meat Company stock, $5,000 in money, which was obtained by discounting a note at the bank, and a note for $4,700. Notice of the dissolution was published in the "Watchman," a paper of little circulation in the city of Omaha, and a copy of this notice was sent to Eugene in Chicago, with instructions to have it published in a daily paper of the least circulation. In the latter part of January, Morris Sloman made a statement of his financial condition to one of the mercantile agencies in Omaha, which statement is as follows:

| | |
|---|---:|
| Merchandise on hand, | $ 41,768 24 |
| Wool on hand in Chicago, | 62,000 00 |
| Hides on hand in Chicago, | 8,500 00 |
| Accounts, | 12,214 59 |
| Bills Receivable, | 421 75 |
| Making the total assets, | $124,904 58 |

| | |
|---|---:|
| Liabilities to the First National Bank of Chicago, secured by warehouse receipts on wool, | $ 48,560 00 |
| Owe First National Bank of Chicago on notes, | 5,800 00 |
| Owe Morris H. Sloman on personal acct., | 1,555 00 |
| Owe Eastern accounts, | 440 11 |
| Owe the Commercial National Bank of Omaha, | 3,000 00 |
| Owe Samuel A. Sloman, | 20,000 00 |
| Making the total liabilities, | $ 79,355 11 |

On the seventeenth of March he made a second statement to the same agency, which is as follows:

| | |
|---|---:|
| Merchandise on hand in Omaha, | $ 41,000 00 |
| Hides in Chicago, | 9,000 00 |
| Book Accounts, | 12,000 00 |
| Bills, | 421 75 |
| Making the total assets, | $ 62,421 75 |

| | |
|---|---:|
| We owe nothing for merchandise, but the Chicago National Bank, | $ 4,300 00 |
| Owe the Commercial National Bank of Omaha, | 10,000 00 |
| Total liabilities, | $ 14,300 00 |
| Leaving net worth, | $ 48,121 75 |

The principal change, as will be noticed, is in the wool on hand in Chicago, and the indebtedness to the Chicago bank, he representing at the time that such indebtedness had been discharged by the sale of wool. About this time he attempted to organize a corporation in Chicago, to be known as the "Chicago Hide & Wool Company," through which, evidently, it was intended that the business in Chicago should be done, but for some reason, not fully and satisfactorily disclosed, this project, after having been initiated, was abandoned. On the thirtieth of March a call report was issued by the Chicago agency, criticising the financial condition of the house, and on April 9th and 12th other call reports

were issued by the Omahá agency, and the rating of the houses was then withdrawn in that agency. From some part in the latter part of March, until the closing up on May 29th, Sloman Bros. were ordering and receiving large quantities of goods. In thus purchasing, the firm dealt not with a few, but with many houses, sending out orders for moderately sized bills, apparently in every direction, so that when the collapse came the unsecured creditors numbered something over a hundred, none of them having very large bills, and yet, in the aggregate, amounting in the neighborhood of $50,000. The secured indebtedness aggregated about the same amount, so that the indebtedness at the time of the failure was fully $100,000, while the stock on hand inventoried only $53,-000, and, in fact, on sale realized much less. In other words, on the seventeenth of March, Morris Sloman appears to have been worth $48,-000, while on the twenty-ninth of May he was at least $50,000 behind hand. Practically, in about two months and a half, a hundred thousand dollars has disappeared. Of course, this indicates either extreme carelessness, great losses, or fraudulent concealment. No satisfactory explanation is tendered; but, on the contrary, Morris Sloman refused to be sworn as a witness until compelled by an order of this court, claiming that his witness fees had been demanded and not paid, and after having been sworn, and while being examined was an unwilling witness, and frequently declined to answer questions put by counsel. The books of the Omaha house were offered in evidence, and several hundred pages of testimony were taken in respect to the facts disclosed by those books. This branch of the testimony has been to me very embarrassing, and one of the matters which has caused the delay in the preparation of this opinion. I take it that it is impossible for one not himself an experienced book-keeper to appreciate fully the import of this testimony. Whether it disclosed merely unskillful book-keeping, or wrong-doing on the part of Morris Sloman, whether the books of the Chicago house, if produced, would have made clear the uncertain entries in the books of the Omaha house or not, are questions which, if this testimony were considered by itself alone, I am frank to say I do not know how I should solve it. Taken in the case they strengthened the conviction that there was something wrong in the financial transactions of Morris Sloman, and if the case turned simply on the controversy between the creditors and him, I should have little hesitation as to the conclusion to be reached. But before the secured creditors can be deprived of the benefit of their security, which is unquestionably legal in form, and duly executed, it must appear that they are privy to the wrong, or responsible for it. Now, that the claims of the complainants represent real debts, there can be no doubt. Most of them are evidenced by notes or drafts made or indorsed by them, and discounted by Sloman Bros. with certain banks, and remaining in their possession at the time of the commencement of this suit, and with regard to all the complainants except Samuel A. Sloman there is not a syllable of testimony to impeach their good faith in the transactions. Meyer Hellman lived in Omaha. He signed a note for $5,000, which was discounted by the commercial Na-

tional Bank. He was a relative by marriage of the Slomans; doubtless that prompted him to lend the credit of his name, for nothing else appears, and, in the absence of testimony, he has a right to rely on the presumption of good faith. The signatures of Samuel Katz, of Omaha, B. V. Paige, of Chicago, C. A. Bresslar, of Bay City, Michigan, are also shown to have been given to other paper, and with no testimony to show the want of good faith. Herman Fechheimer was a merchant in Detroit; Samuel A. Sloman had, prior to coming to Nebraska, been with him many years, first as an employe, and then as a partner. The firm of Sloman Bros., both prior and subsequent to the retirement of Samuel A. Sloman, were in the habit of exchanging notes and drafts with him. Some time in the spring of 1886, Samuel A. Sloman was in Detroit, and urged upon Fechheimer the continuance of these exchanges for the accommodation of his brother, and gave assurance that Fechheimer would be safe in so doing, and that he himself was willing and was rendering like assistance to his brother. There is no reason to doubt that the exchanges were kept up, or that the amount claimed by Fechheimer, and evidenced by the papers presented, were not in fact due, and justly due. It is true none of these various complainants named was himself a witness, but, until some testimony was given tending to show either that the debts were not just or that they were participating in the wrongful conduct of Morris Sloman, I think they had a right to rely upon the presumption of good faith, and relying upon that they are entitled to protection at the hands of the court, and I shall find in their favor.

With regard to the remaining complainant, Samuel A. Sloman, the matter is not so clear; indeed, I find great difficulty in coming to a conclusion as to what the truth is. He was evidently the member of the firm financially responsible. He retired, and, within five months, the collapse came, and the circumstances which led to that collapse indicate intentional wrong on the part of Morris Sloman. Notice of the retirement was given for the purpose of relieving Samuel A. Sloman from further responsibility, but so given as to disclose the intent on the part of Morris Sloman, at least, to retain the benefit of the credit that Samuel A. Sloman's name gave to the business after his retirement. Samuel A. Sloman continued about the store, carried on a large part of the correspondence of the firm, had a desk in the office, and does not seemed to have engaged in any new business. It is true he says that he was simply rendering the services which brotherly affection prompted, and that he simply lent a helping hand whenever, in the pressure of business, his brother needed help, and called upon him for assistance; but it seems impossible to believe that he could have been so constantly in the store, could have taken such part in the correspondence, without being cognizant of what was going on, and aware that some wrong was contemplated. In the early spring he urges Fechheimer to continue his accommodations. Just before the collapse he visits Detroit, and Fechheimer soon thereafter meets him at Chicago, and comes with him to obtain security, and closes out the concern. He induces other of the complainants to sign paper for the accommodation of Sloman Bros., by adding his name

to theirs, and while he denies knowledge of any intentional misconduct on the part of his brother, while he affirms ignorance of his financial condition until a few days prior to the collapse, yet it is difficult to believe that, situated as he was in the store, a witness of what was going on, and taking such part as he did in the business, he did not know and was not in fact privy to the whole scheme. I confess that, upon this matter, I have serious doubts. The testimony is not clear and satisfactory, yet bringing all things to the test of common human experience, it seems to me it must be held that he was cognizant of, and privy to, the wrongful scheme of his brother. Some way and some where within the short time of about 10 weeks, nearly a hundred thousand dollars had disappeared. Can it be that Morris Sloman is the only one who knew of or accomplished such disappearance. I think not. *Web* v. *Armistead*, 26 Fed. Rep. 70; *Krippendorf* v. *Hyde*, 28 Fed. Rep. 788.

My conclusion is that Samuel A. Sloman is not entitled to preference or protection, as against the general creditors. A decree will therefore be entered, securing the other complainants in their preference, and directing that they be first paid out of the funds on hand. The matter will be referred to a master to report what each one has paid, and when, and on the coming in of that report, a final decree will be entered.